Emanuel H. ARD, as Administrator of the Estate of Elizabeth R. Ard, Deceased, Appellant,

v.

SEABOARD COAST LINE RAILROAD COMPANY, Appellee.

James H. MOORE, Jr., as Administrator of the Estate of Loretta B. Moore, Deceased, Appellant,

v.

SEABOARD COAST LINE RAILROAD COMPANY, Appellee.

Nos. 72–2346, 72–2347.

United States Court of Appeals, Fourth Circuit.

Argued June 5, 1973.

Decided Oct. 15, 1973.

Rehearing Denied Dec. 7, 1973.

John A. Martin, Winnsboro, S. C. (Ted H. Bradberry, Winnsboro, S. C., on brief), for appellants.

H. Simmons Tate, Jr., Columbia, S. C. (John H. Lumpkin, Jr., Boyd, Knowlton, Tate & Finlay, Columbia, S. C., on brief), for appellee.

Before BRYAN, Senior Circuit Judge, and FIELD and WIDENER, Circuit Judges.

BRYAN, Senior Circuit Judge:

A train of the Seaboard Coast Line Railroad struck, in the early afternoon of March 25, 1971 near Columbia, South Carolina, a station wagon as it was crossing the track at Brickyard Road, killing the four occupants. Two of these were 11-year old Elizabeth R. Ard and Loretta B. Moore, daughter and sister, respectively, of the driver. Their personal representatives sued in these two actions [1] to recover damages, actual and punitive, for their deaths, laying the blame on the negligence of the Railroad.[2] A verdict was directed for the defendant. The judgment thereon, upon the plaintiff's appeal, will be reversed and a new trial directed.

The trial judge, at the conclusion of all the evidence, appraised the proof as insufficient to allow the jury to find the Railroad negligent. However, when the testimony is viewed in the light most favorable to the plaintiff, as is required on the motion for direction of a verdict, Webb v. Robinson, 241 F.2d 99, 101 (4 Cir. 1957), we think a jury could have found for the plaintiff. As District Judge Chapman pithily phrased it, "[T]he only thing [the plaintiff] has to prove is one act of negligence that operated as *a* proximate cause, not *the* proximate cause, a concurring cause". (Accent in original). Conversely, the inquiry is whether the automobile driver's negligence, if any, was the *sole* proximate cause of the accident.[3]

The plaintiff chiefly ascribes negligence to the defendant's failure to maintain a flagman, flashing lights or other warning precautions at the crossing, and to the operation of trains at a dangerous speed, knowing the crossing was hazardous and heavily travelled.

Plaintiff's proof permitted the jury to deduce these facts. The railroad line, a single track, runs north and south; the train was proceeding northward; and Brickyard Road crosses east and west at

---

1. Each of the cases was brought on a wrongful death statute of the Code of Laws of South Carolina, 1962, § 10–1951, and jurisdiction rested on diversity of citizenship. Since the two embrace identical allegations of negligence, they will be considered together as one suit.

2. The actions were premised on common law negligence alone, with disavowal of any dependence upon the crossing statute, Code of Laws of South Carolina, 1962, § 58–1004.

3. The parties agree that any contributory negligence on the part of the vehicle's driver was not imputable to the other occupants. See Padgett v. Southern Ry. Co., 216 S.C. 487, 58 S.E.2d 895, 898 (1950).

grade. The station wagon was proceeding west to east, having just picked up the decedent child at a school on the west side of the track about a city block away. Both snow and sleet had been falling in the morning causing ice to form on Brickyard Road, but only the snow continued through the day. Because of the weather the school had closed early. The station wagon was headed for U. S. highway #1, paralleling the track on the east side thereof.

The distance from the west or nearest edge of highway #1 to the easternmost rail was less than the length of a bus, so that a bus stopping to enter the highway could not completely clear the track. Apparently, just before the catastrophe, the station wagon was standing behind an automobile which was awaiting an opportunity to turn onto highway #1. At that moment the rear of the station wagon was hit by the train.

Approaching the track from the west on Brickyard Road, the station wagon passed a State railroad warning sign about 450 feet away from the crossing. Next, approximately 335 feet from the crossing, there was a Highway Department "Stop Ahead" sign. Then, written on the surface of the road 138 feet from the track, was a railroad sign "RXR". Further on is a railroad crossing sign and a red "stop" sign, both about 15 feet from the track. Also, there were crossbuck stop signs at the track, indicating the crossing.

To the right of the driver there were four 50-foot boxcars standing on a siding just west of the main track and 325 feet from the crossing. Additionally, to the south of Brickyard Road, some 125 feet from the center of the main track on the west side, was an industrial building. The employees of the industry parked automobiles to the east of this building at right angles to the west side of the track. From the red "stop" sign, visibility was unobstructed for a distance of 2000 to 2500 feet in the direction from which the train was coming.

Closely following the station wagon was an automobile driven by a father with his two children whom he had also just taken from the school. He testified that the station wagon stopped about three feet in front of him before reaching the track. No train, he says, was then in sight. In the next split second he heard a locomotive whistle. By that time the rear end of the station wagon had already progressed onto the track; in front of the station wagon were one or more cars waiting to turn onto highway #1. The train's speed was 60–65 mph. A passenger in a car driving southward on highway #1 near the crossing testified that a building as close as 200 feet was not visible. She said, "[I]t was snowing the hardest I have ever seen".

Statistics showed that 7200 children were bussed over this crossing each school day. Almost three years before the accident, a representative of the school board had written the railroad asking that flashing signal lights be put at this crossing. In reply he was told that the matter would be given careful consideration and Management's decision would be communicated as quickly as possible. No flashing lights were in place on the day of the accident.

█ Of course, this recitation of "facts" disregards the defendant's contradictions of them in the evidence. Our recount is not intended as a *final* resolution in plaintiff's favor of all fact clashes, of impeachments of testimony or of differences in weight of probative evidence. It is simply a narrative of the facts as they were *postulated* by the defendant's motion for a directed verdict. Thus submitted they framed the following issues which, we think, should have been sent to the jury:

1. Whether the railroad was neglectful in not having a flagman, or other means, to regulate the respective movement of trains and vehicles at the crossing, because of the unusual circumstance obtaining there, that is, the inability on occasion of a vehicle, without fault of its

driver, to clear the tracks fully. This is due to the nearness of highway #1 traffic to the tracks, a distance, to repeat, of less than a bus length. Although reasonably careful, a driver might still readily miscalculate the opportunity for completing a transit of the crossing by misjudging the extent of the back-up of the preceding vehicles and the occupiable space remaining.

 "It is the duty of a railroad . . . to give such signals at a public crossing as may be reasonably sufficient, *in view of the peculiar situation and surroundings* at the time, and as will give the public and individuals warning of the approach and *guard them against danger*." (Accent added.) Miller v. Atlantic Coast Line R. Co., 140 S.C. 123, 138 S.E. 675, 687 (1927), cert. denied, 275 U.S. 556, 48 S.Ct. 117, 72 L.Ed. 424 (1927). Of course, there is a reciprocal duty of the traveller to "use his senses of sight and hearing to the best of his ability" to avoid a collision; and his failure to do so may defeat his suit according to the "attendant circumstances". Taylor v. Powell, 195 S.C. 486, 12 S.E.2d 27, 28 (1940).

2. Similarly, a controversy developed in respect to the signals given by the locomotive. Required crossing signals are explicitly laid out by the Code of Laws of South Carolina, 1962, § 58–743. Although defendant's case includes a proof of obedience to these exactions, plaintiff adduces evidence from which, if believed, a jury might find that the whistle blasts, if sounded, were not seasonably given.

Understandably, the Railroad observes that the automobile windows of those witnesses who testified to a delinquency in the giving of the engine's warning signals were closed. Seemingly, it was a circumstance to be anticipated by the defendant in the winter time, especially in a snow storm, but this was a factor for consideration by the jury.

Issues of fact and law are thus posed, and their determination was for the jury on appropriate instructions. In noting these triable issues we do not mean to say they are the only ones, on a new trial, which should be put before the jury. The District Judge may find other fact differences calling for jury resolution.

Because of the existing, but unsubmitted, issues just recited, the District Court's dismissal of the action must be vacated and a new trial granted.

Vacated and remanded for a new trial.